| | |
|---|---|
| WILLIAM J. MURRAY III, | **Case No.: 1:20-cv-01471** |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| NAZARETH REGIONAL HIGH SCHOOL f/k/a NAZARETH HIGH SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN; and XAVERIAN BROTHERS USA INC a/k/a CONGREGATION OF ST. FRANCIS XAVIER, | <u>Jury Trial Demanded</u> |
| Defendants. | |

Plaintiff, William J. Murray III, by and through his undersigned attorneys alleges the following for his First Amended Complaint:

<u>PARTIES</u>

1.      Plaintiff, William J. Murray III, ("<u>Plaintiff</u>") is an adult male, who was sexually abused as a minor in the State of New York.  Plaintiff resides in and is a citizen of the State of California, Los Angeles County.

2.      Defendant Nazareth Regional High School f/k/a Nazareth High School ("<u>Nazareth</u>") was and continues to be a private, Roman Catholic organization and a non-profit religious corporation, duly organized and existing under, pursuant to, and by virtue of the laws of the State of New York, licensed to do and/or transact business within the State of New York, and with a principal place of business at 475 E 57th Street, Brooklyn, New York 11203.[1]

3.      Defendant Roman Catholic Diocese of Brooklyn (the "<u>Diocese</u>") was and continues to be a Roman Catholic organization and a non-profit religious corporation, duly organized and

---

[1] Unless otherwise stated, allegations herein are made regarding all times relevant to this action and believed to be true at all times relevant to this action.

existing under, pursuant to, and by virtue of the laws of the State of New York, licensed to do and/or transact business within the State of New York, and with a principal place of business at 310 Prospect Park West, Brooklyn, New York 11215.

4.     Defendant Xaverian Brothers USA Inc. a/k/a Congregation of St. Francis Xavier (the "Xaverians" or "Xaverian Brothers") was and continues to be a Roman Catholic organization and a non-profit religious corporation dedicated to education and having affiliated schools throughout the United States, specifically herein Defendant Nazareth High School within Defendant Diocese in the State of New York.   Defendant Xaverians are duly organized and existing under, pursuant to, and by virtue of the laws of the State of Maryland, licensed to do and/or transact business within the State of Maryland, and with a principal place of business at 4409 Frederick Avenue, Baltimore, Maryland 21229.

5.     Defendant Xaverian Brothers is a Roman Catholic religious order that owns, uses, possesses, funds and/or operates schools in New York, including Nazareth High School, where some of the sexual abuse alleged herein occurred.

6.     Defendant Xaverian Brothers transacts business in New York and/or contracts to supply goods and/or services in New York.

7.     Defendant Xaverian Brothers regularly does or solicits business in New York.

8.     Defendant Xaverian Brothers engages in persistent conduct in New York.

9.     Defendant Xaverian Brothers derives substantial revenue from goods used or consumed or services rendered in New York.

10.     George Gardiner a/k/a Brother Barton ("Br. Barton") was a Xaverian Brother ordained by the Xaverians and under employ of Nazareth High School and the Diocese as a Roman

Catholic brother, counselor and teacher, under the direct supervision, authority, employ, and control of Defendants. Upon information and belief, Br. Barton is deceased.

11. Hereinafter, Nazareth, the Diocese, and the Xaverian Brothers, will be referred to collectively as "Defendants."

## JURISDICTION & VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the suit is between citizens of different states and the amount in controversy exceeds $75,000.

13. This Court has jurisdiction over Defendants because, on information and belief, (a) Defendants have sufficient minimum contacts in New York, (b) Defendants are citizens of New York, (c) Defendants are authorized to do business in New York, and/or (d) Defendants are registered to do business in New York.

14. Venue is proper in this district pursuant 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims in this action occurred in Kings County, New York.

## STATUTE OF LIMITATIONS

15. Pursuant to the New York Child Victims Act (L 2019, ch 11) (the "CVA"), a victim of childhood sexual abuse in the State of New York whose claim was barred by the statute of limitations is now revived. Such a claim must be brought not later than one year and six months after the CVA became law on February 14, 2019. *See* CPLR § 214-g. Plaintiff's claim is timely.

## FACTS & ALLEGATIONS COMMON TO ALL COUNTS

16. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

17. In 1962, the Vatican in Rome issued a Papal Instruction, entitled *Crimen sollicitationis,* which acted as a company-wide memorandum of policy and procedure and was binding on

all patriarchs, archbishops, bishops, and other local ordinaries across the world, including the bishop of Defendant Diocese and the Xaverian Brothers, which remained in effect until 2001.[2] According to this instruction, allegations and reports of childhood sexual abuse, among other deviant behavior, by clergy and/or religious order members serving in their institutions were required to be kept secret within the confines of the Roman Catholic Church (the "Church"). Additionally, disclosure of such information to civil authorities or to parishioners generally was forbidden.

18.     Defendants' internal and mandated business policies and procedures require their high officials, including the bishop, those in the Diocese, and the Xaverian Brothers, to keep *sub-secreto* files also known as "confidential files", which are not to be made public.

19.     Sexual abuse of minors by Catholic clergy and religious order members has been a reality in the Church for centuries but has remained covered by deep secrecy. Such secrecy stems from the aforementioned official policies and procedures of the Church, including the Diocese and the Xaverian Brothers.

20.     Through the secret files and the procedures for movement and protection of pedophile priests and brothers, the Church as a whole, including the Diocese and the Xaverian Brothers, developed detailed historical institutional knowledge regarding the prevalence of pedophile clergy and brothers, their patterns of conduct, and the patterns of conduct used by various dioceses in solving individual clergy and brother problems in their own jurisdiction through movement and reassignment.

---

[2] Indeed, the March 16, 1962 Crimen sollicitationis published after audience with the Pope, the Church directs *all Patriarchs, Archbishops, Bishops and other Local Ordinaries* to conduct any inquiries into child sexual abuse by clergy "under the secret of the Holy Office," which included, among other things, keeping all documents locked in secret archives known only to these high officials and those within the Church that they chose to share it with. *See http://www.vatican.va/resources/resources_crimen-sollicitationis-1962_en.html* , last visited October 16, 2019.

21.     Because the Diocese and the Xaverian Brothers engaged in the same conduct with pedophile priests and brothers that they had to address, they knew what it may mean when, for example, a priest or brother arrived from a different diocese, school and/or parish without some other clear, non-nefarious explanation for the move.

22.     Recently, the Office of the Attorney General of the Commonwealth of Pennsylvania released a Grand Jury Report ("the Report") consisting of over 800 pages and naming more than 300 Church priests and brothers who were connected to and/or involved in sex crimes against children.[3]

23.     The Report detailed how the Dioceses of Pennsylvania, and its leaders "managed" the ongoing and known sexual abuse of children within the Church.  The investigation detailed in the Report revealed and ultimately illustrated the implemented business practice and pattern utilized throughout the Church worldwide that was instituted not to help children, but to avoid "scandal" (a word used directly by the Church in its documents regarding child sex abuse).

24.     The pattern utilized by the Church generally, and Defendants herein specifically, in carrying out these policies and procedures was even susceptible to behavioral analysis by the Federal Bureau of Investigation.  Special agents testified before the grand jury and identified a series of practices that regularly appeared in the Church files they analyzed:

     a.  First, Church officials, agents and employees make sure to use euphemisms when describing the sexual assaults in documents. For example, they never say "rape," but instead say "inappropriate contact" or "boundary issues."

     b.  Second, the Church does not conduct genuine investigations into the sexual abuse with properly trained personnel. Instead, they assign clergy or religious order members to ask inadequate questions, and then make credibility determinations about colleagues that they live and work with.

---

[3] A downloadable PDF of Report I of the 40th Statewide Investigating Grand Jury, Office of the Attorney General, Commonwealth of Pennsylvania is available at: https://www.attorneygeneral.gov/report/ (last visited Mar. 5, 2020).

c.  Third, after learning of inappropriate behavior by its agents and employees, the Church sends priests or brothers for "evaluation" at *church-run* psychiatric treatment centers.  The Church allows its "experts" to "diagnose" whether the priest or brother is a pedophile, based largely on the priest or brother's "self-reports," and regardless of whether the priest or brother had engaged in sexual contact with a child.

d.  Fourth, when the Church does finally remove a priest or brother or brother, it does not explain why. Parishioners are given broad explanations such as "sick leave" or "suffering from nervous exhaustion." Alternatively, the Church says nothing at all.

e.  Fifth, even if a priest or brother is raping children, the Church continues to provide him housing and living expenses, although he may be using these resources to facilitate more sexual assaults.

f.  Sixth, if a predator's conduct becomes known to the community, the Church does not remove him from the priest- or brotherhood to ensure no more children will be victimized. Instead, the Church transfers him to a new location where no one will know he is a child abuser.

g.  Finally, the Church does not report this behavior to the police even though child sex abuse, even short of actual penetration, is and has been, for all times relevant, **a crime.**  However, the Church does not treat it that way, and has decided to handle childhood sexual abuse like a personnel matter, "in house."

25.  The Report further established a long history and pattern of child sex abuse by the Catholic clergy and religious order members, which was known, tolerated, and hidden by the Church, and the Defendants herein on its behalf, and additionally showed that Defendants tolerate and actively conceal the sexual abuse of children by its agents and employees for their own pecuniary benefit.

26.  Despite these revelations, as well as many criminal and civil actions that the Church has been involved in as a result of clergy or religious order sexual abuse of minors, Church leaders continue to pursue the mandated policy of secrecy.

27.  Refusal to disclose sexually abusive clerics to parishioners is just one way Defendants maintain secrecy.  Another has been to use various forms of persuasion on victims or their

families to convince them to remain silent about the incidents of abuse. These forms of persuasion have included methods ranging from sympathetic attempts to gain silence to direct intimidation to various kinds of threats. In doing so, the Church members and leaders involved, from bishops to priests or brothers, have relied on their power to overwhelm victims and their families.

28. Br. Barton joined the Xaverian Brothers in 1948, and had his first assignment beginning in 1953, at Mount St. Joseph in Baltimore, Maryland. From there Br. Barton was transferred five times until he was placed on a "Leave of Absence" in 1970.

29. Prior to his 1970 Leave of Absence, and pertinent to the case herein, Br. Barton was assigned to Nazareth High School from 1964 to 1965, and from 1967, to his ultimate departure from the brotherhood in 1970.

30. Upon information and belief, while Br. Barton was assigned to work for Defendant Nazareth High School under assignment of Defendants Diocese and Xaverians, he spent his summers working at a Roman Catholic Summer Camp named "Camp Calvert" in Leonardtown, Maryland.

31. In 1965, when Plaintiff was about 12 years old, he began spending his summers attending Camp Calvert, which is where he was introduced to Br. Barton and where Br. Barton's sexual abuse of Plaintiff began.

32. Subsequently, in 1967, Br. Barton presenting as a trusted Roman Catholic brother, convinced Plaintiff's parents to allow him to take Plaintiff to the 1967 International and Universal Exposition or "Expo 67." Instead of taking him to the Expo 67 location, Montreal, Canada, Br. Barton took Plaintiff to the State of New York. Two blocks after entering the New York Port Authority, the sexual abuse began, which lasted for a period of approximately three to four weeks.

33.     Br. Barton also took hundreds of nude and/or pornographic photos of minor-Plaintiff during those three to four weeks in 1967.  Upon information and belief, Br. Barton, as the designated school photographer, utilized the photography equipment provided to him by Defendants.  Br. Barton coerced Plaintiff into behaving by showing him other minor-pornographic magazines, stating that "this is where [Plaintiff's photos] would end up."

34.     Defendant Xaverian Brothers were aware, or should have been aware, of Br. Barton's inappropriate relationship with then-minor Plaintiff, who was not a student at Nazareth High School, and for his non-Church related endeavors, which took him from his religious devotion for nearly a month.

35.     Br. Barton's sexual abuse of Plaintiff occurred in numerous locations around New York City, including at Br. Barton's church-provided living quarters and the Nazareth High School campus premises owned, operated, and/or controlled by Defendants

36.     Br. Barton was the school photographer for Nazareth High School.  As such, he had unfettered access to the Nazareth High School campus, including his very own, secluded photography darkroom.  Br. Barton abused Plaintiff in his darkroom at Nazareth High School.  Plaintiff explains that the dark room was the ideal location for abuse because no one would bother them when the red light outside the room was on, which warned that opening the door could ruin developing photographs.

37.     Roman Catholic schools are referred to as "independent juridic persons" -- the canonical equivalent to a corporation, where ministries are formally sanctioned by a Church authority and carried out publicly under its auspices.  Canon 803 of the 1983 Code of Canon Law identifies three types of schools that can be considered "Catholic" and identify themselves as such: (1) schools directed (*moderatur*) by the competent ecclesiastical authority, (2) schools directed by

a public ecclesiastical juridic person, and (3) schools recognized as "Catholic" in writing by ecclesiastical authority.[4]

38.     Defendant Nazareth, at all relevant times herein, was, and upon information and belief, remains to be a school directed by the competent ecclesiastical authority.  Generally, the "competent authority" with respect to the establishment or operation of a Catholic school is the diocesan bishop or someone canonically equal to a diocesan bishop.[5]  Where a diocesan bishop has the "competent authority", as here for *at minimum* the relevant time period, he has wide powers of governance to oversee, override, or direct the governance and administrative role of pastors as competent authorities in their own right.[6]

39.     For all relevant periods of both (1) the sexual abuse Plaintiff endured (1969) and (2) the employment and/or agency of Br. Barton (1964 to 1965, and from 1967 to his voluntary leave), Defendant Diocese owned, operated and acted as the, and/or a, parent corporation for Defendant Nazareth Regional High School.  At its conception, Defendant Nazareth's predecessor, Nazareth High School, was one of nine schools operated by Defendant Diocese.[7]  The first semester of the initial year of Nazareth High School was spent at the newly completed Bishop Kearney High School since Nazareth's building was yet unfinished.[8]

40.     In 1963, Bishop Brian McEntegart, acting bishop of Defendant Diosese from 1957 to 1968 dedicated the new building, and the first class of freshmen joined the small Nazareth faculty in moving into their own school.[9]  The Catholic people of Brooklyn had given

---

[4] Phillip J. Brown, *Structuring Catholic Schools: Creative Imagination Meets Canon Law*, 13 J. OF CATH. EDUC. 467, 470 (2010), https://digitalcommons.lmu.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1660&context=ce.
[5] *Id.*
[6] *Id.*
[7] Nazareth Reg'l High Sch., 283 N.L.R.B. 116 (1987).
[8] NAZARETH REGIONAL HIGH SCHOOL HISTORY, https://nazarethrhs.org/about/history (last visited Sept. 11, 2020).
[9] *Id.*

millions of dollars to ensure the continuance of Catholic secondary education within the Diocese of Brooklyn.[10]

41.     In 1972, because of the rising costs, Defendant Diocese organized the Henry M. Hald High School Association as an educational corporation for the purpose of operating the Diocesan high school.[11]  Defendant Diocese continued to own and control the schools including Nazareth, and the Bishop of Brooklyn and other churchmen of the Diocese were trustees of the Hald Association.[12]

42.     On August 16, 1974, title to Nazareth High School property was transferred to a newly formed independent educational corporation, Defendant Nazareth Regional High School, to hold title so long as it "continues the operation of a Roman Catholic high school… upon the cessation of which, title and interest…shall revert to the [diocese]."[13]

43.     Defendant Diocese's *current* involvement in the operations of Nazareth is another question, which Plaintiff believes could be remedied through discovery; however, it is irrelevant to its liability during the relevant periods of sexual abuse of Plaintiff and employment and/or agency of Br. Barton.

44.     According to Defendant Nazareth, the school is a Catholic college preparatory high school *sponsored* by the Xaverian Brothers.[14]  Of the concepts and terminology utilized by Catholic governance, "sponsorship is the most inconsistent."[15]

---

[10] NAZARETH REGIONAL HIGH SCHOOL HISTORY, https://nazarethrhs.org/about/history (last visited Sept. 11, 2020); 283 N.L.R.B. 116 (1987).
[11] 283 N.L.R.B. 116 (1987).
[12] *Id.*
[13] NAZARETH REGIONAL HIGH SCHOOL HISTORY, https://nazarethrhs.org/about/history (last visited Sept. 11, 2020); 283 N.L.R.B. 116 (1987).
[14] *Id.*
[15] David L. Caretti, *Ownership, Control, Sponsorship, and Trusteeship: Governance Relationships Within Private Catholic Religious-Sponsored Secondary Schools in the United States*, U. OF S.F. THESES, DISSERTATIONS, CAPSTONES AND PROJECTS, 2013, at 1, 10, https://repository.usfca.edu/cgi/viewcontent.cgi?article=1080&context=diss.

45.     Accordingly, while this term is utilized to describe a religious congregation's relationship to its apostolates, neither the concept nor the term appears in either civil or Canon law.[16] "Sponsorship" is merely a way in which the Catholic identity and particular mission of an institution is maintained, continued, and deepened.[17] Non-diocesan religious institutes whose mission is education, such as the Xavierians, are authorized operate schools, but they may only do so with the express consent and authorization of the diocesan bishop.[18]

46.     Anything inconsistent with Church purposes, for example, sexual abuse of minors by employees of Defendant Nazareth, would authorize the competent authority, here Defendant Diocese, to intervene and take corrective action.[19] While Defendant Diocese, through its bishop, could delegate its aforementioned powers, for example to the Xavierians, they may only exercise those specific power delegated, and only in accordance with the power granted and any limitations placed on its exercise.[20] Additionally, it wasn't until 1994 that Nazareth Regional High School "was formally affiliated with the network of schools sponsored by the Xaverian Brothers American Province."[21]

47.     The Xaverian Brothers have since admitted that Br. Barton is the subject of "credible or established offense(s) against a minor" through a list published on their website.

48.     More importantly, the Xaverian Brothers acknowledge that they have files that were reviewed to establish the accuracy of the allegations of abuse against Brother Burton:

**Q: What process did you follow in preparing the list for release?**

---

[16] *Id.*
[17] *Id.*
[18] Phillip J. Brown, *Structuring Catholic Schools: Creative Imagination Meets Canon Law*, 13 J. OF CATH. EDUC. 467, 473 (2010), https://digitalcommons.lmu.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1660&context=ce.
[19] *Id.*
[20] *Id.*
[21] NAZARETH REGIONAL HIGH SCHOOL HISTORY, https://nazarethrhs.org/about/history (last visited Sept. 11, 2020).

**A**: As part of our last accreditation process with Praesidium Services, the independent agency that has performed accreditation for men's religious communities, we had conducted a review of our files. However, in an attempt to assure accuracy and independent credibility, we contracted with an independent investigator to do a complete review of *our files* in two phases: first, the files against anyone for whom there has been any allegation of sexual abuse of a minor, and, subsequently, our files of all our current members to ensure that there was nothing in any of those files that referenced an allegation of sexual abuse.

**Q: How do you explain the fact that the list does not include the names of Brothers whose name appears on other web sites or whose name was previously made public in the media?**

**A**: The list includes only the names of Brothers against whom there is a *credible and established* claim of sexual abuse of a minor…[22]

49.     By using his position within Defendants' institutions, Br. Barton demanded and required that Plaintiff respect him and his position as a brother and agent of Defendants, teacher, spiritual advisor, confidant, counselor and mentor.

50.     Defendants, in return for the vow of obedience by Br. Barton, accepted responsibility for the care and welfare of him, including provision of his room, board and any pay he might receive.

51.     Defendants were responsible for assigning, transferring, accepting employment from and/or suspending all clergy and/or religious order members, including Br. Barton, to and from its churches, parishes and other Roman Catholic institutions within the dioceses of the State of New York.

---

[22] *FAQ's Regarding the Release of Names of Accused Xaverian Brothers and Procedures for Preventing Abuse*, XAVERIAN BROS., https://xaverianbrothers.org/wp-content/uploads/2019/07/Xaverian-Brothers-FAQs.pdf (last visited Mar. 4, 2020).

52. Defendants, including Br. Barton acting as an agent and/or employee, solicited funds and support from their parishioners and students through memberships, assessments, direct appeals, and/or tuition.

53. A fiduciary-beneficiary relationship and/or special relationship and/or parish-parishioner relationship and/or teacher-student relationship existed between Plaintiff and Defendants and their agents and/or employees as specifically described and/or identified herein, notably Br. Barton.

54. Defendants explicitly and implicitly represented to Plaintiff that each of their priests and brothers, including Br. Barton, were benevolent and trustworthy stewards of the Church who would only act in the best interests of the children whom they served.

55. Plaintiff entrusted his well-being to the Defendants who had corresponding obligation to be solicitous for, as well as protective of Plaintiff in exercise of their positions of superiority and purported authority.

56. Defendants invited and encouraged Plaintiff, as a minor child, to accept each priest and brother assigned to positions within the Church's dioceses and institutions to be in good standing, including Br. Barton, as one who was worthy of and who had the responsibility for Plaintiff's physical and spiritual safety, thereby inducing Plaintiff to entrust himself to the company and care of Br. Barton and subject himself to the authority of and instructions from Br. Barton while on Church property and/or in the accompaniment of Br. Barton.

57. Defendants' agents and/or employees as specifically described and/or identified in this Complaint, Br. Barton, and other employees of Defendants worked together as religious officers who were obligated to arrange, render and coordinate the religious and educational care of the children enrolled in their institutions, including those for Plaintiff which included oversight of

and total responsibility for the protection, prevention of the numerous acts of sexual, mental and physical abuse by their religious order member Br. Barton and reporting their knowledge of the dangers of Br. Barton.

58.     Defendants employed and/or held out as their agents and/or employees as specifically described and/or identified herein all employees implicit in the sexual abuse of Plaintiff by Br. Barton along with any other employee who was involved in the cover-up of the sexual abuse experienced by Plaintiff who were also acting within the course and scope of their respective employment, master-servant and/or agency relationships with Defendants over whom it had direct control and/or a right of control and/or whose actions they ratified as the principals.

59.     The employees discussed herein, including but not limited to, Br. Barton, were the agents and/or employees of Defendants, and acted within the course of employment and/or in the scope of his respective authority.

60.     Any action and/or omission committed by any agent and/or employee of the Defendants and Br. Barton, along with any employee involved in the acts and omissions involved in the cover-up and sexual abuse of Plaintiff, imposes liability upon the Defendants under the laws of agency, *respondeat superior,* vicarious liability, master-servant, and right of control, in the State of New York.

61.     The acts and negligence of Defendants and their agents and/or employees as specifically described and/or identified herein, notably Br. Barton, was a factual cause of and/or placed Plaintiff at an increased risk of harm for and/or was a substantial factor in causing and/or caused the severe, permanent, incurable and grievous injuries and damages described and/or identified herein, most notably the sexual abuse inflicted by Br. Barton which is addressed in detail below.

62.     The permanent and grievous injuries described below, which Plaintiff has suffered and continues to suffer were caused solely and exclusively by the Defendants and their agents and/or employees as specifically described and/or identified herein, notably Br. Barton, and were due in no manner whatsoever to any act or failure to act on the part of Plaintiff.

63.     Because a priest or brother may not be assigned to, or engage in, public ministry without the implicit or explicit permission of his bishop at the diocese from which he was incardinated, by allowing a priest or brother to engage in public ministry, such as by allowing him to wear his religious/ priest or brotherly attire and hold himself out as a priest or brother, Defendants took responsibility for Br. Barton himself, and the projection of good standing, trustworthiness and religious authority presented to the public.

64.     Defendants were, and are, in a position where they had knowledge that Plaintiff did not.  Defendants were in a position to have this knowledge because they had authority and control over Br. Barton and acted as Br. Barton's employer, because Defendants were responsible for Br. Barton, and because their policies mandated and continue to mandate secrecy with respect to the sort of knowledge learned about Br. Barton.

65.     Plaintiff, on the other hand, was a minor child.  As a child, Plaintiff was not in a position to have information about Br. Barton's molestation of other children or Defendants' knowledge, whether actual or constructive, of the dangers that Br. Barton posed to children, nor were they in a position to know that Defendants mandated that their employees keep such knowledge from others, including children like Plaintiff.

66.     All entities, including religious entities, have a duty to prevent injuries inflicted by persons in their employ whom they have reason to believe will engage in injurious conduct.

67.     Defendants knew, should have known, or were otherwise on notice, that Br. Barton had engaged in unlawful sexual-related conduct with minors in the past, and/or was continuing to engage in such conduct with Plaintiff, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by Br. Barton.

68.     Even after signs that the relationship between Br. Barton and Plaintiff had gone too far, with special attention, private access and trips, Defendants still could have taken action to stop some or all of the sexual abuse incidences, but for their willful and wanton disregard for the Plaintiff's safety in the face of significant warning signs. The failure to take action on the re-emerging pattern of grooming behavior and inappropriate boundary-breaking conduct by Br. Barton was willful, wanton and reckless.

69.     Defendants' failure to investigate, vet, or warn Plaintiff before or during his tenure at the Church about Br. Barton, their failure to report Br. Barton's behavior to the proper authorities, or *at a minimum,* to Plaintiff's parents, and their failure to control Br. Barton evidence a willful and wanton disregard for the foreseeable and likely harm that Plaintiff suffered and the lack of action to remove Br. Barton or protect Plaintiff amounted to reckless disregard for the harm that would most certainly continue to occur.

70.     Had Plaintiff or Plaintiff's family, known what Defendants knew or should have known – that Br. Barton was a suspected child molester and a danger to children before Plaintiff was first molested by Br. Barton – Plaintiff would not have been sexually assaulted.

71.     The acts and omissions of Defendants, as plead herein, represents conduct, which is willful, outrageous, reckless and deliberately indifferent to the health, safety, and welfare of children in general and Plaintiff in particular.

72. Plaintiff was placed in the complete care of Defendants by his devout Catholic parents under their guise of religiosity of Defendants' instruction, institutions, agents, and employees. As a minor parishioner Plaintiff was a person who would foreseeably be harmed by such acts and omissions described throughout this Complaint and below.

73. Further the Defendants' actions were taken in order to avoid Church scandal, and thereby, protect its business, membership numbers and donations.

74. As a proximate and direct result of the aforesaid willful, wonton and reckless conduct of the Defendants, Plaintiff sustained the injuries and damages in an amount to be determined at trial.

75. That as a direct and proximate result of Defendants' acts, negligence, gross negligence and conduct described herein, the Plaintiff sustained both physical and emotional injuries and damages, including the following:

    a. Conscious pain and suffering;

    b. Physical, psychological and financial injuries, physical injuries to Plaintiff's body, including, but not limited to, multiple bodily injuries, injuries suffered at the times of the sexual abuse, subsequent mental anxiety, anguish, shame, internal injuries and other injuries;

    c. Severe past, present and future mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and/or future;

    d. Loss of faith and mistrust of the Church and its institutions;

    e. Physical ailments, including, but not limited to headaches, nausea, loss of sleep and physical shock to the nervous system;

    f. Physical injuries to Plaintiff's body including, but not limited to, multiple bodily injuries, injuries suffered at the times of the sexual abuse, subsequent mental anxiety, anguish, shame, internal injuries and other injuries;

    g. Grievous mental and bodily pain and suffering, mental anguish, emotional distress, inconvenience, loss of enjoyment of life, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame;

h.  Past, present and future physical pain and suffering;

i.  Past, present and future medical expenses;

j.  Past, present and future lost wages, loss of earnings and earning capacity;

k.  Punitive damages;

l.  Exemplary damages;

m.  Litigation costs, expenses and reasonable and necessary attorneys' fees; and,

n.  Any and all other damages to which Plaintiff may be justly entitled.

## COUNT I – Negligence

76.  Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

77.  At all times material hereto, pursuant to common law and Restatement (Second) of Agency, § 219, Br. Barton was acting as the agent of the Defendants, because while engaging in the wrongful acts with Plaintiff, Br. Barton was in the course and scope of his respective employment with the Defendants and/or was able to accomplish the sexual abuse because of his job-created authority and role as an agent of the Diocese and Xaverian Brothers.  As such, the Defendants are vicariously liable for the acts of Br. Barton through the doctrine of *respondeat superior*, in addition to its direct liability described here and below.

78.  At all times material hereto, Defendants by and through their agents and employees, accepted responsibility for the well-being of Plaintiff, a minor child.

79.  Defendants had a duty to use reasonable care to protect Plaintiff from known and/or foreseeable risks of harm while they arranged, rendered, and coordinated the religious and educational care of Plaintiff while enrolled in and/or participating in the activities provided by Defendants.

80.     Defendants had a duty to use reasonable care to keep Plaintiff safe from harm while Plaintiff was on their premises and/or attending their educational programs.

81.     Pursuant to Restatement (Second) of Torts, § 317, Defendants had a duty, as masters of Br. Barton, to exercise reasonable care to control Br. Barton while he was on Defendants' premises—that is, the Church-provided and paid-for priest or brother housing and Nazareth High School, even where acting outside the scope of his employment, to prevent Br. Barton from intentionally harming others like Plaintiff.

82.     Defendants breached their duties described above by failing to recognize Br. Barton's pedophilic behaviors and the warning signs thereof.  This is especially true given the context of his prior actions in the Church and the extensive understanding and experience the Defendants had by 1967, with the other pedophilic priests or brothers within the Diocesan and Xaverian ranks.

83.     Both Defendant Diocese and Defendant Xaverian Brothers have since produced lists of "credibly accused" priests and brothers who were engaging in extensive sexual abuse of minor children before, during and after the operative time-period in this case.

84.     Br. Barton's actions were so similar to many other priests and brothers, that by 1967, the Defendant Diocese and Xaverian Brothers, if acting with any level of care, interest or concern, should have known what warning signs to look for in order to invite additional scrutiny over Br. Barton, including *inter alia*, the singling out of Plaintiff for private trips and getaways.

85.     Even if Defendants contend they did not actually know what Br. Barton was doing to Plaintiff at the time, given the sheer numerosity of the abusive encounters, Defendants, if exhibiting any degree of care or curiosity, should have and could have inquired further into the relationship Br. Barton had with Plaintiff to uncover the abuse—the very purpose of the "should have known" standard of care which Defendants breached in this case through their acts and omissions.

Defendants knew, or should have known, that Br. Barton spending so much alone time with Plaintiff, would create an unreasonable risk of harm to Plaintiff.

86.     The kind of conduct that Br. Barton engaged in was foreseeable specifically to these Defendants at all times material hereto based on the extensive and specialized knowledge the Defendants had about the pedophile priest or brother problem within the Church.

87.     Defendants also breached their duties to Plaintiff in other ways, including, but not limited to, failing to exercise reasonable care to monitor the priest and/or brother-parishioner relationship for signs of grooming, and failing to take any steps to limit or prevent unfettered, private access by Br. Barton to Plaintiff on numerous occasions, thereby providing him ample opportunity to sexually abuse Plaintiff.

88.     Defendants knew, or should have known, that it had the ability to control Br. Barton, acting in his service on behalf of Defendants, and that it was necessary to exercise such control to avoid harm and/or the unreasonable risk of harm to Plaintiff.

89.     Defendants failed to exercise such control by, *inter alia*:

    a.  failing to implement policies and procedures that prevented child sexual abuse, rather than promoting secrecy;

    b.  failing to use reasonable care to investigate Br. Barton after hiring him and/or assigning him to the School to care for children;

    c.  failing to train employees and agents in the prevention and reporting of sexual abuse against minors;

    d.  failing to supervise and control the Br. Barton while he carried out his assignments;

    e.  failing to supervise and control the Br. Barton during his time domiciled or staying at Church-provided housing;

    f.  failing to take appropriate steps to prevent Br. Barton from sexually abusing Plaintiff, both initially, and at any time subsequent to the first encounter; and

g. failing to make reasonable decisions about whether or not to retain and/or report Br. Barton once Defendants knew of inappropriate acts and behavior committed by him.

90. Given Defendants' long-standing, mandated policies and procedures, Defendants knew, or with the exercise of reasonable care should have known before and/or during Br. Barton's inappropriate relationship with Plaintiff that Br. Barton was a pedophile, that he was acting or was going to act on those pedophilic tendencies, and that he was grooming and then sexually abusing Plaintiff.

91. Upon information and belief, Defendants are in the possession of documents, data, and/or personal knowledge regarding facts verifying the deviant sexual behavior and tendencies of Br. Barton from before and/or during the sexual abuse of Plaintiff.

92. Defendants failed to exercise reasonable care to control Br. Barton while on Defendants' premises and/or under Defendants' control to prevent him from repeatedly and intentionally harming Plaintiff.

93. As a direct and proximate result of the Defendants acts and omissions, and their agents, servants, workers, or employees acts and omissions, including but not limited to Br. Barton, Plaintiff has experienced the sexual abuse at the hands of Br. Barton, as well as the ensuing physical, mental, psychological, economic and noneconomic injuries and damages discussed herein, which Plaintiff still continues to suffer.

94. As a direct and proximate result of Defendants' acts and omissions discussed above, Plaintiff suffered significant injuries and damages in an amount to be proven at trial.

95. In addition to direct acts and omissions by Defendants constituting Negligence as described above, Defendants are also vicariously liable for their agents, employees and representatives' acts, including Br. Barton, under the doctrine of *respondeat superior*.

## COUNT II - Negligent Retention and Supervision

96. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

97. Defendants were responsible for decisions relating to supervising, assigning, transferring, and/or suspending all clergy members and/or members of religious orders, including Br. Barton, within their Roman Catholic institutions, including entities such as Nazareth High School.

98. At all times material hereto, Br. Barton was in an employer-employee relationship with Defendants when he sexually abused Plaintiff on Defendants' premises.

99. Defendants failed to exercise reasonable care to control, supervise, train, and retain Br. Barton in a number of respects, including but not limited to:

   a. failing to use reasonable care to investigate Br. Barton prior to assigning him to the institution(s) listed above, at which he was to provide care for and teach minors;

   b. failing to train employees and agents, including Br. Barton, in the prevention and reporting of sexual abuse against minors;

   c. failing to supervise and control Br. Barton while he carried out his brotherly assignments at Defendants' institutions, including Nazareth High School, and while at his Church-provided living accommodations;

   d. failing to notice the concerning relationship Br. Barton began having with Plaintiff which went beyond a normal "student-teacher" or "priest or brother-parishioner" relationship; and

   e. failing to make reasonable decisions about whether or not to retain and/or report Br. Barton once Defendants knew of inappropriate acts and behavior committed by him.

100. Defendants' above-described business policies and procedures of concealing, and ultimately promoting, the widespread knowledge and acts of pedophilic tendencies of its clergy and religious order members, provided Defendants' with the actual and/or constructive knowledge that Br. Barton was himself engaged in this deviant behavior.

101. With the exercise of reasonable care, Defendants knew or should have known before and/or during the pendency of Br. Barton's tenure within their Roman Catholic institutions, including Nazareth High School, that he had a tendency to sexually abuse minor children.

102. As a direct and proximate result of Defendants' negligent retention and supervision of Br. Barton as discussed above, Plaintiff suffered significant injuries and damages in an amount to be proven at trial.

## COUNT III - Negligent Infliction of Emotional Distress

103. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

104. At all times material, Defendants' acts and omissions created an unreasonable risk of causing Plaintiff emotional distress.

105. As described above, Plaintiff's emotional distress was reasonably foreseeable where Defendants failed to prevent extended, private contact with Br. Barton and the resultant sexual abuse that was allowed as a result through the acts and omissions described above and incorporated herein by reference.

106. Further, upon information and belief, Br. Barton's numerous assignments and transfers correspond with the Defendant Xaverian Brothers and Defendant Diocese's concurrent knowledge of Br. Barton's sexual abuse of minors.

107. Upon information and belief, the Defendants instituted transfers of Br. Barton's based on contemporaneous knowledge of numerous acts of sexual abuse, in keeping with the Defendants' pattern of secrecy and reassignment. Additionally, such transfers were utilized to protect Defendants' own pecuniary and reputational interests.

108. Defendants' acts and omissions were a proximate cause of Plaintiff's emotional distress.

109. As a result of Defendants' breach, Plaintiff's physical safety was endangered and he was unreasonably placed in fear of physical harm from Br. Barton's sexual abuse, as described above.

110. As a direct and proximate result of both Defendants' acts and omissions, including suppression of knowledge and failure to reveal Br. Barton's sexual abuse of minors and/or restrict his access to minors, Plaintiff suffered sexual abuse at the hands of Br. Barton, which resulted in an unreasonable danger to his physical safety, and constantly left Plaintiff in fear for his own safety.

111. Defendants' acts and omissions were the direct cause of the Plaintiffs' injuries and damages in an amount to be proven at trial.

## COUNT IV - Gross Negligence

112. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if set forth at length herein.

113. At all times material, Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiff.

114. At all times material, Defendants had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of the young children enrolled in their institutions, young children seeking religious counseling, and their minor parishioners, including Plaintiff.

115. At all times material, Defendants had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law

against their young children enrolled in their institutions, young children seeking religious counseling, and their minor parishioners, including Plaintiff.

116. This duty existed because of a monetary tithing paid by Catholic parishioners and those enrolled in its institutions across the United States and within the State of New York, which Defendants accepted to fund and promote their own initiatives.

117. Defendants breached their duty of care by acting with reckless disregard of the safety and welfare of Plaintiff and other innocent children by failing to properly investigate and report the known and tolerated pedophile activities of their clergy and/or religious order members. Additionally, Defendants breached their duty of care by placing their own personal interest in front of the safety of the young children enrolled in their institutions, young children seeking religious counseling, and their minor parishioners, including Plaintiff.

118. Defendants were more concerned with their reputation than protecting the aforementioned children, including Plaintiff. Such conduct engaged in by Defendants constitutes gross negligence as it was, and is, wanton and willful, reckless, and in conscious disregard of the safety of innocent children, including Plaintiff.

119. As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has experienced the sexual abuse at the hands of Br. Barton, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiff still continues to suffer.

120. Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees, and other relief that this Court may deem proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, based on the foregoing causes of action, Plaintiff demands judgment against Defendants, Nazareth Regional High School f/k/a Nazareth High School; Roman Catholic Diocese of Brooklyn and Xaverian Brothers USA Inc. a/k/a Congregation of St. Francis Xavier, on the above causes of action, in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction; for a sum that will fully and fairly compensate Plaintiff for alleged injuries and damages, that Plaintiff recovers actual damages; that Plaintiff is entitled to recover compensatory damages; that Plaintiff recovers punitive damages; and for such other further relief; together with costs and disbursements of this action; and such other and further relief as the Court deems proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury as to all issues.


**D'ARCY JOHNSON DAY, PC**

Dated: New York, New York          By: */s/ Peter W. Smith*_____
     September 11, 2020               Peter W. Smith
                           PWS@DJD.LAW
                           1501 Broadway, 12th Floor
                           New York, New York 10036
                           (866) 327-2952


**MATTHEWS & ASSOCIATES**

                     By: **/s/ David P. Matthews**_____
                           David P. Matthews
                           DMATTHEWS@THEMATTHEWSLAWFIRM.COM
                           Liza L. Roys (*admitted pro hac vice*)
                           LROYS@THEMATTHEWSLAWFIRM.COM
                           Mark E. Chavez*
                           MCHAVEZ@THEMATTHEWSLAWFIRM.COM
                           2509 Sackett St.
                           Houston, Texas 77098
                           (713) 522-5250

**FREES & GOSS**

By:  **/s/ Tim K. Goss**_____

Tim K. Goss
TIM@FREESEANDGOSS.COM
Peter De La Cerda*
PETER@FREESEANDGOSS.COM
3500 Maple Ave., Suite 1100
Dallas, Texas 75219
 (214) 761-6610

*Attorneys and Co-counsel for Plaintiff*

*\* Texas counsel will be seeking pro hac vice admission.*